UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK
_____

KIMBERLY MARIE COOK,

                                            Plaintiff                    DECISION AND ORDER

-vs-
                                                                         15-CV-6408 CJS

COMMISSIONER OF SOCIAL SECURITY,

                                            Defendant.

_____


APPEARANCES

For the Plaintiff:              Howard D. Olinsky, Esq.
                                Olinsky Law Group
                                300 South State Street, Suite 420
                                Syracuse, New York 13202


For the Defendant:              Benil Abraham, Esq.
                                Social Security Administration
                                Office of General Counsel
                                26 Federal Plaza, Room 3904
                                New York, New York 10278

                                Kathryn L. Smith, A.U.S.A.
                                United States Attorney's Office
                                100 State Street, Fifth Floor
                                Rochester, New York 14614


INTRODUCTION

        This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Kimberly Cook ("Plaintiff") for Social Security Disability

Insurance Benefits ("SSDI") and Supplemental Security Income Benefits ("SSI").  Now

before the Court is Plaintiff's motion (Docket No. [#10]) for judgment on the pleadings

1

and Defendant's cross-motion [#15] for judgment on the pleadings.  Plaintiff's application is denied, Defendant's application is granted, and this action is dismissed.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the parties' submissions, which contain detailed recitations of the pertinent facts.  The Court has reviewed the administrative record [#8] and will reference it only as necessary to explain this Decision and Order.

Plaintiff was born in 1981, and completed high school (63).  Plaintiff also completed two years of college, earning an Associate's Degree in "human services." (49, 197).  Plaintiff has worked as a cashier at a dollar store, as a deli worker in a supermarket, as cook in a fast-food restaurant, and as a child-care provider in a daycare center. (30).  About these jobs, Plaintiff stated, when applying for disability benefits: "At all jobs I had issues controlling my temper and emotions.  Out of the eight jobs I left because of my emotions, anxiety or no body want[ed] to work with me.  I'm snappy and don't realize it." (211).  On another application form, Plaintiff stated:  "4 out of eight job I los[t] because of my att[it]ude." (219).

Plaintiff is divorced and lives with her two children – a daughter age nine and a son age six. (35-36).  Plaintiff indicates that her son receives SSI benefits because he is "autistic," "has ADHD" and "mood disorders" (36), while her daughter has "ADHD." (55).  Plaintiff indicates that both children take medication for their conditions, which she administers.  (55).

On August 10, 2011, Plaintiff reportedly told her primary care physician, David Breen, M.D. ("Breen") that back pain was bothering her "on and off." (275).

2

On September 1, 2011, Plaintiff reportedly told Breen that she had twisted the muscles in her lower back while playing with her son. (273).

On September 15, 2011, Breen reported that Plaintiff had received nerve block injections in her lumbosacral spine, "with good response." (276) ("Low back pain improved with injections. Continued low level pain intermittently."). Breen further noted that Plaintiffs "depression and anxiety" were "well treated at this time." (276).

On or about October 22, 2011, Breen referred Plaintiff to Livingston County Counseling for "cannabis abuse." (279).

On November 4, 2011, Plaintiff saw Breen for follow-up on her back pain. (272). Plaintiff reportedly stated that she had "broken up" with her husband, and felt good about that, but was stressed because her son was not sleeping. (272). Plaintiff indicated that her back pain was still a "problem," but that she was only taking Vicodin "occasionally," and was exercising and had lost weight. (272). Plaintiff further stated that she had not been taking her "mental health meds," but wanted to re-start taking them, because she felt "overwhelmed." (272).

On November 8, 2011, Breen's office reported that Plaintiff had telephoned, "demanding an appointment at mental health." (271). Office notes indicate that Breen had previously referred Plaintiff to "Noyes Mental Health," but that Plaintiff had not attended any sessions during 2011. (271).

On December 5, 2011, Plaintiff complained to Breen of low back pain. Upon examination, Breen noted "bilateral lumbar spasm" and limited range of motion. (270). Breen's impression was "lumbo-sacral strain," for which he prescribed exercise and Vicodin. (270).

On January 17, 2012, Plaintiff reportedly told Breen that she was having severe pain in her right forearm. (269).

On January 26, 2012, Plaintiff left Breen's practice and became a patient of Shaikh Ahmed, M.D. ("Ahmed"), who noted that Plaintiff claimed to have a history of bipolar disorder, but was not taking medication. (292). Ahmed further noted that Plaintiff's mood was "stable" since splitting from her husband. (292). Ahmed's physical examination was normal. (292).

On August 8, 2012, Plaintiff had an initial mental health intake evaluation at Noyes Memorial Hospital. (314) Plaintiff reported having a history of "mood fluctuations including anxiety, depression, and anger, low self esteem, difficulty adjusting to major life changes including ongoing divorce, family conflict [and] struggles managing her children and their mental health concerns." (314). Plaintiff indicated that she was not taking medications "due to her belief that they do not work." (314).

On August 13, 2012, Ahmed reported that Plaintiff was working at a hospital, and was continuing to smoke. (284). Ahmed's physical examination was normal. (284).

On August 22, 2012, Ahmed reported that Plaintiff was complaining of feeling "overwhelmed at work, can't handle two kids at home [with autism and ADHD]." (282).

On August 30, 2012, Plaintiff reportedly told her therapist that she intended to obtain "long term disability coverage," but would have to "endure ongoing financial struggles until she was able to [do so]." (317). Plaintiff reportedly expressed the view that her life was becoming more difficult, and that nothing worked out for her, while "everyone else has it so easy." (317). Plaintiff further indicated that she did not take her prescribed thyroid or depression medications consistently. (318).

On September 14, 2012, Plaintiff told her therapist that she had woken up that morning in an irritable mood, and "knows she will not be able to be around people today." (319). Plaintiff acknowledged that she verbally lash[ed] out" at people and "often overreact[ed] to circumstances," but felt that she "ha[d] reasons for her behavior based on her past." (319).

On September 17, 2012, Ahmed noted that Plaintiff was complaining of worsening back pain. (280). However, upon examination, Ahmed found no muscle spasm or other objective findings; the examination was completely normal, with full range of motion and negative straight-leg raising. (280).

On September 25, 2012, despite Plaintiff's expressed hope to obtain long-term disability, Noyes indicated that as part of her treatment plan, she was required to "actively engage in career counseling work in order to identify overall objectives for possible occupations." (348); *see also, id*. at 354 (noting that one of the objectives of Plaintiff's plan of treatment was to "establish plans for future employment and finances.").

On October 3, 2012, Virginia Wohltmann, M.D. ("Wohltmann") performed a psychiatric evaluation in connection with Plaintiff's treatment at Noyes. (325-327). Plaintiff reported problems with "moodiness and irritability" for many years, as well as racing thoughts and anxiety. (325). Upon examination, Wohltmann found that Plaintiff's affect was "quite variable," inasmuch as she was "tearful and upset" at times, and "loud and irritable" at other times. (327). Wohltmann's diagnosis was, *inter alia*, "mood disorder [not otherwise specified]," and she recommended that Plaintiff continue outpatient mental health therapy and thyroid treatment. (327). In particular, Woltmann

5

emphasized that Plaintiff needed to take her thyroid medication, in addition to the mental health medication, because "thyroid dysfunction . . . can impact mood in a significant way." (327).

On October 10, 2012, Plaintiff's therapist expressed concern over whether Plaintiff was "benefitting from therapy due to lack of consistent attendance." (323).

On October 15, 2012, Plaintiff told her therapist that "things appear to be gradually improving in her life," but that she did not want to schedule therapy appointments "more frequently than every two weeks," because of her "anxiety about leaving home." (324).

On November 5, 2012, Plaintiff underwent an internal medicine examination at the Commissioner's request. (335-338). Karl Eurenius, M.D. ("Eurenius") examined Plaintiff, and noted that she was complaining of "chronic right leg pain, chronic back pain, chronic right arm pain and COPD." (335). Plaintiff reportedly told Eurenius that she took care of her children and home by herself, but needed help with cleaning "on occasion." (336). Eurenius's physical exam was essentially normal, except that in the lumbar spine, Plaintiff had decreased flexion, with pain and tenderness, and positive straight-leg raising bilaterally. (337). Eurenius opined that Plaintiff would be "moderately limit[ed] in prolonged sitting, standing, walking, climbing, bending, lifting, carrying, pushing, and pulling, due to a combination of chronic low back pain and right thigh pain." (338). Eurenius further stated that Plaintiff would be "mildly" limited in lifting, carrying, reaching and handling objects with her right arm, due to right elbow pain. (338).

On November 5, 2012, Plaintiff underwent a psychiatric evaluation by Yu-Ying Lin, Ph.D. ("Lin"), at the Commissioner's request. (339-343). Plaintiff reportedly told Lin that she had left her last job "due to stress and interpersonal difficulties." (339). Plaintiff indicated to Lin that she had experienced "depressive symptoms on and off for years, [which had] worsened five years ago after a car accident." (339). Plaintiff claimed that "since 18 or 19 years old," she experienced manic symptoms "daily with each time lasting five minutes to hours." (340). Plaintiff further indicated that she had panic attacks daily. (340). Plaintiff indicated that "she always leaves the house with company," and also claimed to have visual and auditory hallucinations. (340). Plaintiff reportedly stated that she took care of the house ("cooking, cleaning, laundry, and shopping"), drove, and managed her own money (though she was not good at managing money). (341). Plaintiff stated, though, that her medical conditions made her daily functions "difficult at times," and that she sometimes needed assistance from her mother-in-law. (341). Upon examination, Lin reported that Plaintiff appeared "dysphoric and anxious," but that her thought processes were coherent and goal directed, her insight and judgment were fair, and her cognitive functioning was "below average to average." (341). Lin opined that Plaintiff's "attention and concentration" were "mildly impaired due to anxiety in the evaluation," and that her memory similarly seemed to "impaired due to anxiety." (341). Lin offered the following opinion:

> The claimant can follow and understand simple directions and instructions. She can perform simple tasks independently. She may have difficulty maintaining attention and concentration. She is not able to maintain a regular schedule. She can learn new tasks. She can perform complex tasks with supervision. She may have difficulty making appropriate decisions. She cannot relate adequately with others. She

cannot appropriately deal with stress.  Difficulties are caused by stress-
related problems and lack of motivation.    The results of the examination
appear to be consistent with psychiatric problems, and this may
significantly interfere with the claimant's ability to function on a daily basis.

(342).

On November 19, 2012, Plaintiff reportedly told Ahmed that she was unable to

work "due to social anxiety." (426).

 On January 15, 2013, Dr. Ahmed noted that Plaintiff's "mood is stable." (424).

On May 29, 2013, Plaintiff reportedly told Ahmed that she had been having back

pain for a week, that was "episodic," though Ahmed's physical examination of her back

was unremarkable. (414).

On June 5, 2013, Plaintiff went to Livingston County Mental Health to seek

treatment, rather than to Noyes.  At that time, Livingston Mental Health completed an

intake note for Plaintiff. (372).  Plaintiff indicated that she was seeking treatment for

"depressed mood and anxiety," and "ha[d] retained an attorney and [was] seeking

disability." (372).  Plaintiff indicated that her "depression is a 10" and that she had

"some suicidal thoughts," though "with no plan or intent." (372).  Plaintiff indicated that

she had left mental health treatment at Noyes because her therapist "was rude and did

not say much." (372).  Plaintiff denied any use of drugs, including marijuana. (373).

Upon examination, the therapist noted that Plaintiff was "tearful" and had an "anxious"

mood, but otherwise the examination was unremarkable. (376).

On June 12, 2013, Noyes discharged Plaintiff from mental health treatment,

noting that she had transferred to Livingston County Mental Health to obtain treatment.

(354).  In her notes closing the file, Plaintiff's therapist stated that Plaintiff had "often"

missed appointments and had "frequently reported physical health problems that impacted her mood, [which] frequently ma[de] her irritable and resistive in sessions." (354). The therapist further noted that Plaintiff had made only "minimal progress" because of her "reluctance to engage in sessions." (354). The therapist also noted that Plaintiff had apparently decided not to continue with therapy at Noyes after her session on May 6, 2013, when she had been "uncooperative and hostile in session, and [had] left the building after 20 minutes." (354). (Plaintiff referred to this during the hearing, noting that she stopped attending mental health therapy at Noyes because she "had a really huge meltdown with [her] therapist." (58)). The therapist further indicated that Plaintiff did not fully meet the criteria for a diagnosis of "intermittent explosive disorder," but had a history of bipolar disorder and attention deficit hyperactivity disorder, based upon her "self-report of difficulty concentrating and high energy levels, as well as [her] fluctuating mood." (352).

On July 10, 2013, Plaintiff's therapist at Livingston Mental Health, nurse practitioner Marybeth Peterson ("Peterson"), reported that Plaintiff was feeling "depressed, sad, [and] angry," and that she had been in "fights with family members." (379). Upon examination, Plaintiff appeared "sad" and "anxious," with a flat affect, impaired insight and poor judgment. (382).

On July 30, 2013, orthopedic specialist Jennifer Paul, M.D. ("Paul"), saw Plaintiff upon referral from Dr. Ahmed. (449). Paul reported that Plaintiff was complaining of severe lower back pain, as well as muscle pain in the middle of her back. (449). Paul advised Plaintiff to take flexeril, to use heat on the lower back, and to "start [physical therapy] as previously ordered." (451).

On August 1, 2013, Plaintiff reported stated that she felt "overwhelmed" by her finances and difficulties caring for her children.

On August 19, 2013, Plaintiff told Peterson that she worried about her "children and lack of money," but did not feel that she could work, "due to her depression." (384). Plaintiff admitted that she was not taking Klonipin as directed for anxiety. (385).

On August 23, 2013, Dr. Ahmed noted that Plaintiff was "absolutely noncompliant" with her thyroid medications. (409).

On September 11, 2013, Plaintiff told Peterson that she had begun taking her medication as directed and felt "emotionally better." (387) ("The client reports that she still has days of depression, but it is getting better.").

On October 8, 2013, Dr. Ahmed noted that Plaintiff was "compliant with meds [and] doing well." (405).

On October 9, 2013, Peterson reported that Plaintiff was "doing better." (390).

On October 24, 2013, Plaintiff was seen at Noyes Hospital by Chirag Patel, M.D. ("Patel"), for lower back pain. (368). Plaintiff reportedly stated that her low back pain had begun in 2011, without any apparent cause. (368). Patel obtained an MRI study, which was "positive for mild broad base disc bulge," "moderate to severe left sided foraminal stenosis " and "moderate right sided foraminal narrowing." (368). Patel further reported finding "18/18 trigger points associated with fibromyalgia." (369). Patel scheduled Plaintiff for an L4/L5 epidural steroid injection, and prescribed Cymbalta. (369).

On November 15, 2013, Plaintiff reportedly requested an appointment with Dr. Ahmed, so that she could tell him about her "generalized body aches" and "generalized

joint pain other than back, digits, hip knee." (401). Once again, though, Dr. Ahmed's physical examination was unremarkable. (401).

On December 3, 2013, Plaintiff reportedly told Dr. Patel that she was having severe (10/10) pain in her "low back radiating to all parts of [her] back," which increased with "walking a lot [and] standing a lot," but which "decreases with sitting for short periods." (444). Patel's impression was "lumbar discogenic pain syndrome" and "spinal stenosis of the lumbar region." (445). Patel performed another "L4/L5 epidural steroid injection" and prescribed "Tizanidine." (367).

On December 4, 2013, Plaintiff was "sad and tearful," because her "husband stopped paying child support," and she had been "fighting with a friend and her sister." (396).

On December 9, 2013, Dr. Ahmed discussed with Plaintiff the results of a nerve conduction study concerning carpal tunnel syndrome, and the fact that Dr. Patel had diagnosed carpal tunnel syndrome. (399). Ahmed's physical examination of Plaintiff was unremarkable. (399).

On December 10, 2013, Nurse Practitioner Peterson completed a "Mental Residual Functional Capacity Form." (453-456). Peterson indicated that as of that date, she had been treating Plaintiff for approximately five months. (453). Peterson indicated that Plaintiff's diagnoses were "mood disorder nos" and "anxiety disorder nos." (453). Peterson opined that Plaintiff was "markedly impaired" in the following work-related abilities: ability to maintain attention and concentration for extended periods; and, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number

of rest periods.  (455).  Peterson opined that Plaintiff was "moderately impaired" with regard to remembering locations and work-like procedures; understanding, remembering and carrying-out detailed instructions; performing activities within a schedule, maintaining regular attendance and being punctual; and setting realistic goals and making plans independently of others. (455-456).

Peterson indicated that Plaintiff was "*not* significantly impaired" in the following areas:  ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism and supervisors; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (455) (emphasis added).  This aspect of Peterson's opinion is surprising, since according to Plaintiff, the primary reason she was unable to keep a job was her inability to get along with others, including co-workers, supervisors and customers. (34, 54, 211, 219).

On January 21, 2014, Dr. Ahmed reported that Plaintiff was "doing well," "taking meds regularly" and "voic[ing] no complaints." (468).

On February 26, 2014, Ahmed completed a report concerning Plaintiff's residual functional capacity to perform physical work-related activities. (459-464).  Ahmed indicated that Plaintiff's physical impairments did not prevent her from performing typical activities of daily living. (464).  Ahmed further stated that Plaintiff should never lift more than fifty pounds or work in unprotected heights.  Otherwise, though, Ahmed indicated that Plaintiff could frequently lift and carry up to 20 pounds; occasionally lift and carry up to fifty pounds; sit for four hours at time; stand and/or walk for up to two hours at a time; sit and/or stand for up to six hours in a workday; and walk for up to four

12

hours in a workday. (459-460).

PROCEDURAL BACKGROUND

Plaintiff claims to be unable to work, due to impairments including carpal tunnel syndrome, chronic obstructive pulmonary disease ("COPD"), bipolar disorder, panic disorder, generalized anxiety disorder, mood disorder, intermittent explosive disorder, thyroid problems and lumbar pain. (30-31, 49). Plaintiff also claims to experience residual pain from a car accident nine years ago, in which she sustained leg and arm fractures, though she indicated that she is not receiving treatment for such pain. (50). Plaintiff claims a disability onset date of August 29, 2012. (29). In that regard, Plaintiff claims that in August 2012, she was working as a cashier at the Dollar Tree store, but experienced anxiety and pain, and "g[ot] in enormous arguments with employees [and] management." (34).

The Commissioner denied Plaintiff's claim initially. The Commissioner noted that the decision was based upon a review of Plaintiff's medical records, including those from Noyes (for the period 9/15/11-5/16/12), Breen, Ahmed, Eurenius and Lin. (121). In that regard, on November 23, 2012, non-examining agency review psychologist T. Harding, Ph.D. ("Harding") completed a mental residual functional capacity assessment. (69-73, 82-84). Harding found, based upon evidence including Wohltmann's evaluation (71), that Plaintiff was "not significantly limited" with regard to most mental work-related functions, but that she was "moderately limited" with regard to the following: maintaining attention and concentration for extended periods; performing activities within a schedule; maintaining regular attendance; being punctual; completing a normal workday and workweek without interruptions from psychologically-based symptoms;

13

interacting appropriately with the public; accepting instructions and criticism from supervisors; and responding appropriately to changes in the work setting. (70-71).

On February 6, 2014, a hearing was held before an Administrative Law Judge ("ALJ"). (25-62). When asked why she was unable to work, Plaintiff indicated that she "h[as] a lot of trouble leaving her house," and has "so much pain" that she needs to "just sit down and rest." (34). Regarding her claimed inability to leave the house, Plaintiff stated that it is because she has "really bad anxiety," "get[s] real paranoid," and "get[s] really irritated sometimes at people." (44). As for her claimed inability to get along with people, Plaintiff testified, "[S]ometimes certain conversations will set me off for no reason." (45). Plaintiff also testified that she experienced "panic attacks," consisting of her getting "sweaty" and "nervous," and crying. (45). Plaintiff stated that she suffers such attacks "25, maybe 30 times" per month. (46). Plaintiff indicated that her mental health medications were somewhat helpful. (47, 48). Plaintiff testified that she received therapy for her mental impairments, but could not remember the therapist's name, and had "problems keeping schedules and stuff." (47).

Regarding pain, Plaintiff indicated that she was able to perform household chores, but that it took her a long time because she needed to stop and take breaks, due to pain. (37). Plaintiff indicated that she was able to walk less than half a block at one time, due to pain. (40-41). Plaintiff indicated that she used a cane to ambulate at times, though it was not prescribed by a doctor. (41).[1]

---

[1] When Plaintiff applied for benefits she indicated that she did not use a cane or other assistive device. (218).

At the hearing Plaintiff asserted that she really couldn't perform her daily activities without assistance from others.  For example, Plaintiff testified that she took the children to their appointments, such as to "doctors" and "Career Center," but that "most of the time" she had someone else go with her. (55-56).  Similarly, Plaintiff stated that although she drove and had a driver's license, she usually needed another adult to accompany her when she left  home. (36).  Plaintiff further stated that she had a friend or relative accompany her when she went grocery shopping, in case she decided to go and sit in the car, due to back pain, and that she sometimes needed the other adult to finish the shopping for her. (37).  Plaintiff also testified that she occasionally needed family members to help her maintain her home.

However, when Plaintiff applied for benefits, she indicated that she took care of the home and children by herself, doing "pretty much everything" for the children, without any assistance. (213). At that time, Plaintiff also indicated that she performed all "house and yard work" by herself. (215).  Further, when asked, on the application form, "When you go out, can you go alone?," Plaintiff answered, "Yes." (215).  On a different form, Plaintiff stated that she is "able to travel by [her]self." (221).

On May 6, 2014, the ALJ issued his decision, denying Plaintiff's application for benefits. (9-20).  Applying the familiar five-step sequential analysis used to evaluate disability claims, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since August 21, 2012. (11).  At step two, the ALJ found that Plaintiff has the following severe impairments: "lumbar spine degenerative disc disease, a history of fractured right elbow and right femur, a mood disorder, and bipolar disorder." (11).  The ALJ also found that Plaintiff has the following non-severe

impairments: COPD, hypothyroidism and carpal tunnel syndrome. (12). At step three of

the analysis, the ALJ found that none of Plaintiff's impairments met or medically-

equaled the severity of a listed impairment. (12-13).

Prior to reaching step four of the analysis, the ALJ found that Plaintiff has the

following residual functional capacity:

> [C]laimant has the residual functional capacity to perform light work . . .
> except she should avoid more than occasional overhead lifting with either
> upper extremity. She retains the ability to understand and follow simple
> instructions and directions, perform simple tasks with supervision and
> independently, maintain attention/concentration for simple tasks, regularly
> attend to a routine and maintain a schedule, and relate to and interact
> with others to the extent necessary to carry out simple tasks, but should
> avoid work requiring more complex interaction or joint efforts with other
> coworkers to achieve work goals and should have no more than
> occasional brief interaction with the public. She can handle reasonable
> levels of simple work-related stress in that she can make decisions
> directly related to the performance of simple work and handle usual work
> place changes and interactions associated with simple work.

(14). The ALJ indicated that in making that assessment, he had considered the

medical evidence and opinion evidence in accordance with the Commissioner's

regulations. (14). In discussing the medical opinion evidence of physical impairments,

the ALJ gave limited weight to Eurenius's opinion, in part because it was vague and

could be interpreted multiple ways. (15). The ALJ gave significant weight to Ahmed's

opinion because of his "treating relationship with the claimant," but not controlling

weight because it was "not entirely supported" by the record evidence. (16). Regarding

Plaintiff's mental impairments, the ALJ gave only limited weight to Lin's opinion, noting,

in part, that it "was inconsistent with the claimant's activities." (17). On that point, the

ALJ discussed why Plaintiff's activities of daily living were not consistent with a finding of disability, including that she was "able to live alone with and take care of her two young disabled children." (16).  The ALJ similarly gave limited weight to Peterson's opinion, because she was not an acceptable medical source, because she had not treated Plaintiff very long, and because her  opinion was inconsistent with Plaintiff's "activities and demonstrated abilities." (18).  The ALJ gave significant weight to Harding's opinion, both because it was supported by the record evidence and because it was based upon a "review of the claimant's records," unlike Lin's opinion. (17).  The ALJ further noted that when Plaintiff actually complied with her doctors' instructions and took her medications, she improved. (17).

At step four of the sequential analysis, the ALJ found that Plaintiff was unable to perform her past relevant work because those jobs "require[d] socialization." (18).  However, at the fifth and final step, the ALJ found, using the grids as a framework, that Plaintiff can perform other work that exists in significant numbers in the national economy. (19).  In that regard, the ALJ noted that there was no need for testimony from a vocational expert ("VE"), because Plaintiff was essentially able to perform a full range of unskilled light work, and her nonexertional impairments (limiting her interaction with others) did not significantly erode  the occupational base for unskilled jobs. (19).

Plaintiff appealed (5), but the Appeals Council declined to review the ALJ's determination. (1-3).

On July 10, 2015, Plaintiff commenced this action.  On February 22, 2016, Plaintiff filed the subject motion [#10] for judgment on the pleadings, and on May 23, 2016, Defendant filed the subject cross-motion [#15] for the same relief.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the
Commissioner of Social security as to any fact, if supported by substantial evidence,
shall be conclusive." The issue to be determined by this Court is whether the
Commissioner's conclusions "are supported by substantial evidence in the record as a
whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496,
501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It
means such relevant evidence as a reasonable mind might accept as adequate to
support a conclusion." *Id.* If the Commissioner applies the correct standards and the
decision is supported by substantial evidence, "the Commissioner's decision must be
upheld, even where substantial evidence may support the plaintiff's position and despite
that the Court's independent analysis of the evidence may differ from the Secretary's."
*Alves v. Colvin*, No. 13-CV-3898 RPP, 2014 WL 4827886, at *5 (S.D.N.Y. Sept. 29,
2014) (citation omitted).

DISCUSSION

The ALJ's RFC Determination

Plaintiff first maintains that the ALJ erred by giving significant weight to Harding's
opinion, while giving only limited weight to the opinions of Lin and Peterson. Plaintiff
contends that, "[i]n doing so, the ALJ failed to comply with regulations regarding
weighing opinion evidence, resulting in an unsupported RFC which is contradicted by

the record."[2]  On this point, Plaintiff argues that ALJs should not rely on opinion

evidence from "a non-examining physician who has never seen the Plaintiff,"

particularly when making "mental health disability determinations."[3]  Plaintiff suggests

that the ALJ violated 20 C.F.R. § 404.1527(c)(1) by doing so, though she concedes that

the regulation provides only that the opinions of examining physicians should

"generally" be given more weight.  Plaintiff further contends that the ALJ "cited no

specific reason" why Harding's opinion was entitled to more weight than the opinions of

"examining physicians."[4]  Plaintiff also contends that the opinions of Lin and Peterson

are more consistent with each other and with the record than was Harding's opinion.

Defendant responds that the opinions of non-examining sources can, at times,

override the opinions of treating sources, provided that they are supported by evidence.

Defendant further contends that Harding's opinion is well-supported by the totality of the

evidence.  Additionally, Defendant notes that the ALJ accepted much of Lin and

Petersons's reports, and that insofar as he rejected aspects of those reports, he gave

good reasons for doing so.

The Court determines that Plaintiff's arguments lack merit.  To the extent that

Plaintiff contends the ALJ erred merely because he gave more weight to the opinion of

a non-examining source than he gave to the opinion of an examining source, the Court

disagrees. *See*, SSR 96-6p, 1996 WL 374180 at *3 (SSA Jul. 2. 1996) ("In appropriate

circumstances, opinions from State agency medical and psychological consultants and

---

[2]Pl. Memo of Law [#11] at p. 16.

[3]Pl. Memo of Law [#11] at p. 17.

[4]Pl. Memo of Law [#11] at p. 18.

other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."); *see also, Camille v. Colvin*, 652 F.App'x 25, 26-29 (2d Cir. Jun. 15, 2016) (ALJ did not err by assigning more weight to opinion of non-examining State agency consulting psychologist than to opinion of treating psychologist).

Plaintiff next contends that the ALJ erred by offering "no specific reason" why he gave less weight to the opinions of Lin and Peterson than he gave to Harding's opinion. The Court again disagrees. As mentioned earlier, the ALJ indicated that one reason he gave more weight to Harding's opinion was because Harding had reviewed all of Plaintiff's medical records that were available at the time, while Lin and Peterson evidently had not. (17, 121). More importantly, the ALJ indicated that he found Harding's opinion to be more consistent with the overall record and with Plaintiff's activities. For example, the ALJ stated that Peterson's opinion was inconsistent with Plaintiff's demonstrated ability to provide care to "two young disabled children." (18). Indeed, the fact that Plaintiff is apparently able to provide adequate care for her children under those circumstances seems inconsistent with Lin's opinion that Plaintiff cannot maintain concentration or keep a schedule, and with Peterson's opinion that Plaintiff would have a marked inability to maintain attention. In sum, the Court finds that the ALJ gave specific reasons for the weight that he assigned the subject opinions, and that those reasons are supported by substantial evidence.

Plaintiff nevertheless insists that Dr. Lin's report is both supported by her clinical findings and consistent with the record. The ALJ found otherwise, and such finding is supported by substantial evidence in the record. For example, Lin's report indicates

(based upon what Plaintiff told Lin) that Plaintiff cannot leave the house alone and that she experiences visual and auditory hallucinations, but those statements are not consistent with the record as a whole. Similarly, Lin's opinion that Plaintiff cannot maintain a schedule seems at odds with the fact that she maintains an entire household by herself, including caring for two school-age disabled children. On that point, the Court notes that Lin's report contains no mention of the fact that Plaintiff's children have mental and emotional impairments, or that she is responsible for administering their medications. (36, 55). Further, with regard to clinical findings, it is difficult to see where, for example, Lin made clinical findings that support her opinion that Plaintiff is completely unable to maintain a regular schedule, completely unable to relate adequately with others and completely unable to deal with stress.

Further, Lin's opinion that Plaintiff is completely unable to relate adequately with others is contradicted by Peterson's report, which indicates that Plaintiff is "not significantly impaired" in dealing with other people. (455-456). In addition to being completely opposite from each other in this regard, neither Lin's nor Peterson's opinions on this particular point seem well supported by the record. On the other hand, Harding's opinion that Plaintiff is "moderately" limited in dealing with the public and with supervisors seems better supported by the record.

<u>The ALJ's Credibility Determination</u>

Plaintiff next contends that the ALJ's credibility determination was erroneous and unsupported by substantial evidence. In particular, Plaintiff maintains that the ALJ did not specifically consider the factors set forth in 20 C.F.R. § 416.929(c). Further, Plaintiff contends that the ALJ erred by viewing her non-compliance with treatment as detracting

21

from her credibility. In this regard, Plaintiff states: "[T]he ALJ failed to view Plaintiff's noncompliance in context, as it is actually a symptom of her depression and anxiety, and highlights the severity of her symptoms."[5]

Defendant responds that Plaintiff's non-compliance with treatment was just one of many factors that the ALJ considered when evaluating her credibility. Further, Defendant maintains that the ALJ properly considered the circumstances of Plaintiff's non-compliance, contrary to what Plaintiff maintains. Defendant also states that while Plaintiff now attributes her non-compliance to her depression and anxiety, the record indicates that she previously gave other reasons, including her belief that the medications did not work and her desire not to gain weight.

The Court notes that, although Plaintiff claims the ALJ "erred in considering the required factors" for assessing credibility, the ALJ specifically indicated that he evaluated Plaintiff's credibility in accordance with 20 C.F.R. § § 404.1529 and 416.929. (14-15). When evaluating a claimant's credibility, the ALJ is required to consider the factors set forth in those regulations, but is not required to explicitly discuss each one. *See, Pellam v. Astrue*, 508 Fed.Appx. 87, 91, 2013 WL 309998 at *3 (2d Cir. Jan. 28, 2013) ("The ALJ did not apply an incorrect legal standard when judging the credibility of Pellam's testimony. Although the ALJ did not explicitly discuss all of the relevant factors, Pellam has failed to point to any authority requiring him to do so. In any event, the ALJ cited the applicable regulation, 20 C.F.R. § 404.1529, explicitly mentioned some of the regulatory factors (such as Pellam's limited use of pain medication), and

---

[5]Pl. Memo of Law [#11] at p. 21.

stated that he considered all of the evidence required by § 404.1529."). If it appears that the ALJ considered the proper factors, his credibility determination will be upheld if it is supported by substantial evidence in the record. *Id.* Accordingly, to the extent that Plaintiff is arguing the ALJ erred by not expressly discussing the required factors, the argument lacks merit.

The primary thrust of Plaintiff's credibility argument, however, is that the ALJ did not properly consider whether her mental impairments were to blame for her admitted non-compliance with treatment. On this point, the Court notes, preliminarily, that it is clear from the record that Plaintiff was in fact largely non-compliant with her doctor's treatment recommendations. For example, Plaintiff routinely stopped taking medications unilaterally, or took doses different from those that were prescribed, and only attended three physical therapy sessions, contrary to her doctors' instructions. Moreover, as the ALJ noted, Plaintiff's condition improved when she took her medications. (16, 17). This caused the ALJ to observe that, "throughout the record, the claimant was noncompliant with medications and attendance, which brings into question the severity of [her] symptoms." (18).

An ALJ should not use a claimant's non-compliance to draw a negative credibility inference without first attempting to discern the reason for the non-compliance. *See, e.g., Mitchell v. Colvin*, 584 Fed.Appx. 309, 313–14 (9th Cir. 2014) ("[D]isability adjudicators are 'not [to] draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain...failure to seek medical treatment' " SSR 96–7p at *7.

23

Agency rules instead advise that 'to determine whether there are good reasons the individual does not . . . pursue treatment in a consistent manner,' disability adjudicators 'may need to recontact the individual or question the individual at the administrative proceeding.' *Id*.").

Here, for the most part, the ALJ observed the many instances in which Plaintiff was non-compliant, but did not discuss the possible reasons therefore. (17). Presumably, that is because there does not appear to be any good reasons why Plaintiff was non-compliant.  Rather, Plaintiff admitted that she did not take the medications because she did not think that they were effective.  The ALJ did, however, note one specific instance in which Plaintiff cancelled a mental health therapy session, purportedly because she had a "busy schedule and family obligations." (17, 356).  On the other hand, Plaintiff now attributes her non-compliance to her depression and anxiety, but none of her treatment providers have made such a connection.  On these facts, the Court finds that the ALJ did not err by citing Plaintiff's non-compliance as a factor that detracted from her credibility.

<u>The ALJ's Decision Not to Obtain Testimony from a Vocational Expert</u>

Plaintiff next contends that the ALJ erred, at step five of the sequential analysis, by failing to obtain testimony from a VE.  On this point, Plaintiff states: "Plaintiff suffers from significant nonexertional impairments, thereby necessitating the introduction of vocational expert testimony.  If a plaintiff's nonexertional impairments significantly limit the range of work permitted by his exertional limitations, the ALJ is required to consult with a vocational expert." Pl. Memo of Law [#11] at p. 22 (*citing Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986) and "SSRs 83-12, 85-15, 96p, 00-4p").  Plaintiff further

24

states that if she can only have limited contact with co-workers and the public, as the ALJ found, then she cannot perform the basic mental demands of unskilled work, citing SSR 85-15.[6]

Defendant responds that the ALJ properly used the grids as a framework, rather than obtaining VE testimony, because Plaintiff's work capacity is not significantly diminished by her nonexertional limitations.

SSR 85-15, which Plaintiff cites, observes that nonexertional impairments "may or may not significantly narrow the range of work a person can do." SSR 85-15, 1985 WL 56857 at *2 (1985). SSR 85-15 further states that the extent to which a nonexertional impairment reduces a person's occupational base "may range from little to very much, depending on the nature and extent of the impairment(s)," and that "[*i*]*n many cases*, a decisionmaker will need to consult a vocational reference." *Id*. at *3 (emphasis added). SSR 85-15 indicates that once it has been determined how the nonexertional impairment affects the claimant's occupational base, the ALJ must consider "whether the person can be expected to make a vocational adjustment considering the interaction of his or her remaining occupational base with his or her age, education, and work experience." *Id*. at *3. The SSR states that "[i]f, despite the nonexertional impairment(s), [the] individual has a large potential occupational base, he or she would ordinarily not be found disabled in the absence of extreme adversities in age, education, and work experience." *Id*.[7] The SSR adds, though, that in making this

_____

[6]Pl. Memo of Law [#11] at p. 22.

[7]Plaintiff in this action does not claim to have extreme adversities in age, education or work experience.

determination, "[t]he assistance of a vocational resource may be helpful." *Id*.

SSR 85-15 goes on to describe the basic mental demands of unskilled work as follows:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

*Id*. at *4.

In the instant case, Plaintiff argues that the ALJ's RFC finding confirms that she cannot perform these basic mental demands of unskilled work, because it directs that she "should avoid work requiring more complex interaction or joint efforts with other coworkers to achieve work goals and should have no more than occasional brief interactions with the public."[8]   However, the basic mental demands of unskilled work, as set forth earlier, do not require interaction with the public.  Accordingly, the issue is whether the limitation on Plaintiff's ability to interact with co-workers significantly limits the occupational base of light unskilled work.  In particular, the Court understands the RFC to mean that Plaintiff would have difficulty working as a team with co-workers to achieve work objectives.  Or, more simply, it seems to mean that Plaintiff should work alone to complete her work tasks, even though she is capable of normal incidental

_____

[8]Pl. Memo of Law [#11] at p. 22.

interaction with co-workers while doing so.  Accordingly, the issue is whether a requirement that a claimant work alone significantly limits the occupational base of light unskilled work, to the point that an ALJ must consult a VE to determine whether she can perform other work.

The Court finds that it does not. *See, Garcia v. Comm'r of Soc. Sec.*, 587 F. App'x 367, 370 (9th Cir. 2014) (Finding that ALJ properly concluded that claimant's limited capacity to work with others did not significantly erode the base of unskilled light work, and that the ALJ therefore "properly declined to call a vocational expert."); *see also*, *Oliver v. Berryhill*, No. 2:16-cv-01846 CKD, 2017 WL 4038388 at *6-7 (E.D. Ca. Sep. 13, 2017) (Limitation that claimant have only occasional contact with co-workers did not "qualify as a substantial loss of ability to meet the basic requirement of being able to respond appropriately to supervision and coworkers," and therefore did not require the ALJ to consult a VE).  Consequently, the Court determines that the ALJ did not err by deciding not to consult a VE.

## CONCLUSION

Plaintiff's application [#10] for judgment on the pleadings is denied, Defendant's cross-motion [#15] is granted, and this action is dismissed.

So Ordered.

Dated: Rochester, New York      ENTER:
    October 3, 2017

                          */s/ Charles J. Siragusa*
                          CHARLES J. SIRAGUSA
                          United States District Judge